IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| TORQUED-UP ENERGY SERVICES, INC. | § | Case No. 15-60796-11 |
| | § | |
| ARCTIC ACQUISITION CORPORATION D/B/A COUGAR PRESSURE CONTROL | § | Case No. 15-60798-11 |
| | § | |
| TORQUED-UP ENTERPRISES, LLC DEBTORS | § | Case No. 15-60799-11 |

**DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
AUTHORIZING THE USE OF CASH COLLATERAL
AND GRANTING ADEQUATE PROTECTION**

TO THE HONORABLE BILL PARKER, UNITED STATES BANKRUPTCY JUDGE:

Torqued-Up Energy Services, Inc. ("TUES"), Arctic Acquisition Corporation d/b/a Cougar Pressure Control ("Arctic") and Torqued-Up Energy LLC ("Enterprises"), the Debtors, as Debtor and Debtors-in-Possession, file this Motion (the "Motion") pursuant to Bankruptcy Rule 4001(b) for entry of interim and final orders authorizing the use of Cash Collateral and granting adequate protection. In support of this Motion, Debtors respectfully represent as follows:

**JURISDICTION AND VENUE**

1.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334. This Motion constitutes a "core" proceeding pursuant to 28 U.S.C. §157(b)(2)(A), (D), (M) and (O). Venue is proper before this Court pursuant to 28 U.S.C. §§1408 and 1409.

1

## BACKGROUND

2. On November 20, 2015 (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

3. The Debtors continue to manage and operate their business as Debtors-in-Possession pursuant to §§1107 and 1108 of the Bankruptcy Code. No trustee, examiner or committee has been appointed in this case at the time of the filing of the Motion.

## ABOUT THE COMPANIES

4. TUES has operated as a leading provider of premium coiled tubing and related pressure services, primarily in Texas. It was originally incorporated in Delaware on November 30, 2007 as Torqued-Up Holdings, Inc. The Company's name was formally changed to Torqued-Up Energy Services, Inc. on April 28, 2008. Its corporate headquarters and home office is located in Tyler, Smith County, Texas with satellite locations in Texas located in the towns of Monahans, Henderson, and Teague. The Company's current President and CEO, Kelly Prentiss, joined the Company in December, 2008. In addition to having been a certified public accountant for over 25 years, Mr. Prentiss has financial management, and restructuring experience in the telecommunications, oil and gas and real estate industries. During his career he has raised over $350,000,000.00 of public debt, negotiated bank financings, managed IPO process and reorganized a telecommunications company through Chapter 11 bankruptcy. His financial experience encompasses many areas including strategic and financial planning, financial reporting, treasury, investor relations, SEC reporting, budgeting, tax, risk management, accounting, human resources and inventory management. Mr. Prentiss holds a Bachelor's

degree in accounting from the University of Texas and an MBA in finance from the University of North Texas.

5. During Mr. Prentiss's tenure as President and CEO, the Company saw revenues grow approximately from $34 million in 2009 to $114 million in 2014.

6. The Debtor is not a public company, with its stock being owned primarily by private equity funds.  TUES has two wholly owned non-operating subsidiaries Arctic and Enterprises. Arctic and Enterprises, while non-operating, are guarantors on TUES debt to the senior secured lenders and have pledged assets to secure that debt.

## **SECURED LENDERS AND CAPITAL STRUCTURE**

7. Torqued Up Energy Services, Inc., as borrower, Amegy Bank National Association, as, among other things, administrative agent (in such capacity, "Administrative Agent"), and certain financial institutions as lenders, including Wells Fargo Bank, National Association (the "Lenders") are parties to that certain Credit Agreement dated as of March 30, 2011 (as amended, restated, or otherwise modified from time to time, the "Credit Agreement"). Additionally, Torqued Up Energy Services, Inc, as borrower, and Arctic Acquisition Corp. and Torqued-Up Enterprises, LLC, as guarantors, and the Administrative Agent are parties to that certain Guaranty Agreement dated as of March 30, 2011 (the "Guaranty Agreement," and together with the Credit Agreement, and all other mortgage, security and pledge agreements and all other documentation executed in connection with any of the foregoing, each as amended, supplemented, or otherwise modified, the "Loan Documents").  Under the Guaranty Agreement the Debtors have granted a first priority lien and security interest in, to and against substantially all of their assets (the "Prepetition Collateral") as set forth in the Loan Documents to the Administrative Agent and Lenders.

8.  Pursuant to the Loan Documents, the Debtors are indebted and liable to the Administrative Agent and Lenders for all loans and other obligations described therein and payable thereunder (the "First Lien Indebtedness").  The aggregate principal amount outstanding under the Credit Agreement is approximately $12,261,882.30 as of the Petition Date, plus accrued and unpaid interest, fees, and expenses.

9.  As of October 9, 2015, the Company had on hand the sum of approximately $1.2 million in cash.  The Debtor also owns approximately $3 million in outstanding accounts receivables of which approximately $1.5 million is collectible.[1]  The company's cash, accounts receivable, and proceeds of accounts receivable are subject to the liens under the Loan Documents.

10.  The Company's other non-insider, third-party debt is approximately $1.5 million as of October 9, 2015, consisting largely of approximately 41 capital leases.

11.  The Company has unsecured subordinated debt (referred to herein as "sub-debt") which has been advanced by one or more equity owners over time.  That sub-debt is contractually subordinated to the secured debt of the Banks and as of October 9, 2015, totals in the amount of $32.5 million.  No interest or other payments have been made on the sub-debt.

## **EMPLOYEES**

12.  As of the time of the filing, Debtor has 18 employees, both salaried and hourly. Prior to shutting down operations, as described below, the Debtor had approximately 80 employees.  Salaried employees are paid every two weeks.  Hourly employees are also paid every two weeks but with a one week "lag" in that their paycheck does not reflect the hours worked during the immediately preceding week.

---

[1] Of the $3 million in A/R's on the books, $1.4 million is due from Greenfield Energy Securities, a Ch. 7 debtor in Delaware and the Company has recorded the entire amount as likely non-collectible.

4

**EVENTS LEADING TO BANKRUPTCY**

13. Debtor is an oil field services company. The recent and precipitous decline in oil prices has had a dramatic effect upon Debtor's business. Not only has the amount of new completions substantially decreased but, primarily over the past year, Debtor's competitors have often bid the remaining projects at continuously smaller margins and, in Debtor's opinion, sometimes below cost just for the purpose of keeping market share and their crews busy while waiting on a turn-around in the industry.

14. Understanding the environment in which it has been placed, Debtor has undertaken steps to minimize its exposure, including professional marketing efforts for the Company as well as a program to sell assets which were either unutilized or under-utilized. Since July 9, 2015, Debtor has been operating under a forbearance agreement with the Banks but that forbearance agreement, as amended, expires on November 30, 2015. Although Debtor has enjoyed a good working relationship with the Banks, and hopes to continue to do so, nevertheless the concern exists that the Banks may choose to offset funds in the Debtor's operating accounts and/or foreclose on the equipment and accounts receivable.

15. During the latter part of October and first part of November 2015, Commander Energy Services, Inc. expressed interest in purchasing substantially all of Debtors' tangible operating assets and ancillary equipment. After consultation with the Banks, that expression of interest has resulted in a Letter of Intent ("LOI") between Debtors and Commander. That LOI is the subject of a separately filed motion to approve sales procedures regarding the assets covered by the LOI.

16. During this same time period, management has carefully evaluated its current business operations, its declining cash position and the prospects of maintaining its operations

during the current market conditions. As a result, Debtors reluctantly made the business determination to shut down operations on November 13, 2015, save for those employees necessary to wind down operations, assemble the equipment for sale and otherwise maximize the value for the Debtors' estates. This request for use of cash collateral for a limited time period should be considered in that context.

## RELIEF REQUESTED

17. Pursuant to this Motion and §361(c) of the Bankruptcy Code, the Debtor seeks interim and final orders authorizing the use of Cash Collateral (as defined below), in which the Administrative Agent and Lenders assert a security interest. The Debtor requests authority to use Cash Collateral in accordance with the interim Budget attached hereto as Exhibit "A" (the "Budget") on an interim basis and, in accordance with any subsequent Budgets hereafter approved by the Court, on a final basis.

18. In addition, and as described further below and in the proposed order, under §§ 361 and 363(e) of the Bankruptcy Code, the Debtor seeks to grant adequate protection to the Banks for any diminution of the value of the Pre-Petition Collateral (as defined below) as a result of the use of Cash Collateral and the imposition of the automatic stay through, among other things, the issuance of adequate protection liens in favor of the Banks.

19. The relief requested herein is necessary to prevent immediate and irreparable harm to the Debtor's Chapter 11 estate and should provide sufficient funds, on an interim basis, to permit the Companies to satisfy their payroll and other direct operating expenses as is necessary to wind down the business and sell assets. The Debtors request approval for interim use of Cash Collateral through December 18, 2015 on an interim basis (the "Interim Order") and thereafter on a permanent basis (the "Final Order").

20. Prior to filing this Motion, the Debtors sought and obtained consent to use Cash Collateral of the Lenders. Such consent is conditioned upon the Court's entry of an order in the form attached to this Motion as Exhibit B.

## BASIS FOR RELIEF

21. The Debtor estimates that, as of the Petition date, it has cash deposits in various bank accounts totaling approximately $900,000.00 and holds collectible receivables of approximately $1,200,000.00. Additionally, the Administrative Agent and Lenders hold liens against substantially all of the Debtors' assets, including Debtors' equipment, cash and receivables. To the extent of any diminution in value in the Administrative Agent and Lenders' Prepetition Collateral, including Cash Collateral, occasioned by the Debtor's use of such collateral, the Debtor proposes to grant the Bank the adequate protection described in the proposed interim cash collateral order, which includes, replacement liens on all tangible and intangible property of the Debtor now existing or hereafter acquired in an amount equal to any post-petition diminution in the value of its Prepetition Collateral (the "Adequate Protection Liens"), all as set forth with more particularity in the proposed order.

22. The Adequate Protection Liens will be subject to any valid, perfected and unavoidable liens existing as of the Petition Date that are senior to the Lender's prepetition liens, and any valid and senior liens that may arise or be perfected post-petition under § 546(b). The Adequate Protection Liens will otherwise prime all other liens, including any liens preserved for the benefit of the Debtor's estate under § 551.

23. The terms of adequate protection recited in this order are a summary of provisions of the proposed order only, and reference should be made to the proposed order for all of its terms. Nothing in this Motion is intended to modify terms of the proposed order.

24. The Adequate Protection Liens will be subject to "Carve Outs" as more particularly described in the proposed order, but including for the payment of (i) all statutory fees required to be paid by the Debtors to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code; (ii) prior to termination of Cash Collateral use, accrued and unpaid fees, disbursements, costs, and expenses (the "Professional Fees") incurred by professionals or professional firms retained by the Debtors or their estates pursuant to Bankruptcy Code sections 327, 328, or 363 and any statutory committee (the "Committee") appointed in the Chapter 11 Case pursuant to Bankruptcy Code section 1103 (collectively, the "Professionals") to the extent (and only to the extent) (x) set forth in the approved Interim Budget and (y) allowed or approved by the Court (including on an interim basis); and (iii) following termination of the use of Cash Collateral, the Professional Fees allowed by this Court in an aggregate amount not exceeding [$25,000]. However, (x) the Carve Out shall not be available to pay any Professional Fees incurred by any party, including the Debtors, a trustee, or any Committee or any Professionals engaged thereby, in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Administrative Agent or Lenders, it being understood that up to an aggregate of [$15,000] shall be made available to any Committee for investigation costs.

25. To the extent that the adequate protection described above proves to be insufficient, the Lender, subject to the Carve-Out, shall be granted first priority superpriority administrative expense claims under section 507(b) of the Bankruptcy Code with priority in payment over any other administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113 and 1114 of the Bankruptcy Code,

whether or not such expenses or claims arise in these Chapter 11 Cases or in any subsequent case or proceedings under the Bankruptcy Code that may result therefrom.

26. As additional adequate protection, the Debtor is required to provide certain specified financial and operating information to the Lender and to pay the fees and expenses of the Lender's professionals on an ongoing basis without further order of court, provided that this Court will determine any dispute about the reasonableness of such fees raised by the Debtor

27. The Company's continued use of the Pre-Petition Collateral for the purpose stated maximizes the position of the Company's creditors, including the Administrative Agent and Lenders.

28. The Company has no material source of income other than from its operations and the collections of its accounts receivable. At the present time an immediate and critical need exists for the Company to be permitted access to funds in order to continue the operation of its business, to pay its employees, and to protect its ability to maximize the value of its assets in accordance with Chapter 11 of the Bankruptcy Code.

29. Pursuant to §363(c)(2)(B) of the Bankruptcy Code, the Debtor requests that the Court authorize and approve the Company's use of Cash Collateral for the payment of its limited operating expenses in accordance with the Budget and with subsequently issued Budgets. To remain in possession of its property, to continue the Company's business activities, and to achieve a successful reorganization, the Company requests use of Cash Collateral in the Company's wind down operations. The Company currently has no present alternative borrowing source from which the Company could secure additional funding to operate its business. The Company believes that payment of operating expenses is reasonable and that such payment is for

necessary business expenses which must be paid in order to continue the Company's business operations.

30. Without the use of Cash Collateral, significant losses will result to the Debtor's estate and its creditors.

## ADEQUATE PROTECTION

31. The Bankruptcy Code expressly provides that the granting of a replacement lien constitutes a means of adequate protection. 11 U.S.C. § 361(2). The granting of replacement liens provides ample adequate protection of the Lenders' interest in cash collateral. See, e.g., *MBank Dallas, N.A. v. O'Connor (In re O'Connor)* 808 F.2d 1393 (10th Cir. 1987); *In re Dixie-Shamrock Oil & Gas, Inc.* 39 B.R. 115, 118 (Bankr. M.D. Tenn. 1984).

32. To the extent ordered by the Court, Debtor is prepared to provide adequate protection to Lenders in the nature of replacement liens as set forth herein. Specifically, Lender shall be granted (effective upon the Petition Date and without the necessity of the execution by the Debtor of additional mortgages, security agreements, pledge agreements, financing statement or other documents) replacement liens, but solely to the extent of their actual interest in the Prepetition Collateral and any diminution in their secured position as a result of the Debtor's use of the Prepetition Collateral, including Cash Collateral, upon (i) all assets in which a validly perfected lien existed as of the Petition Date, (ii) all property acquired by the Debtor after the Petition Date that is of the exact nature, kind or character of prepetition collateral, (iii) all cash and receivables attributable to Lender' prepetition collateral, (in each case of (i), (ii), and (iii), subject to valid and unavoidable liens that senior in priority to the liens of the Administrative Agent and the Lenders) and (iv) all unencumbered property of the Debtors. The Debtor anticipates that the replacement accounts, receivables, inventory, and proceeds derived

therefrom, acquired through the use of Cash Collateral will adequately protect the Lender for its use of Cash Collateral. In this regard, it is anticipated that Debtor will, within the 30-day period of the cash collateral budget, submit to the court a motion to sell assets.

### NOTICE AND REQUEST FOR HEARING

33. Pursuant to Federal Rule of Bankruptcy Procedure 4001, the Debtor has caused a copy of this Motion and the proposed interim order to be served via e-mail or facsimile upon the Lender or their counsel, all other secured claimants known to Debtor, and the United States Trustee, and by first class mail on all other persons listed on the attached matrix.

34. The Debtor requests that the Court conduct an emergency, interim hearing on this Motion as soon as possible and that the Court schedule a final hearing on the Motion at least fourteen (14) days thereafter, and at such final hearing, authorize the Debtor's continued use of Cash Collateral pursuant to the budget attached hereto.

FOR THESE REASONS, the Debtor prays that an emergency, interim hearing be held on this Motion as soon as possible, with a final hearing to be scheduled thereafter, and that the Court authorize the use by the Debtor of Cash Collateral on both an interim and a final basis with adequate protection for the Lender as set forth herein. The Debtor further requests such other and further relief as this Court may deem just and proper.

Date:  
                                                      Respectfully submitted,  
                                                     IRELAND, CARROLL & KELLEY, P.C.

                                                     BY: */s/ Patrick Kelley*  
                                                     Patrick Kelley  
                                                     State Bar No. 11202500  
                                                   6101 S. Broadway, Suite 500  
                                                   Tyler, Texas 75703  
                                                   Tel: (903) 561-1600  
                                                   Fax: (903) 581-1071  
                                                   patkelley@icklaw.com

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing document has been served on all parties-in-interest on November 24th 2015.

/s/ Patrick Kelley